Day, J.
l. equity corpora--' tion. —I. The question which, first presents itself for our consideration is as to the nature and extent of the jurisdiction of a court of equity over a corporation, at the suit of a stockholder therein, The caseS; perhaps, cannot all be fully harmonized, but as to most of them, it is believed, the conflict, upon examination, will' be found to be more apparent than real.
In the case of the Attorney-General v. The Utica Ins. Co., to which our attention has been directed by appellant, an information was -filed by the attorney-general, ex officio, against the defendants, charging that they were chartered alone as an insurance company, and that without any authority under the act incorporating them, and, in violation of the act to restrain unincorporated banlting associations, they had embarked-in the business of banking.
The information prayed for an injunction to restrain the company from the business incident to incorporated banks.
*146 It was simply a proceeding instituted, not by tbe corporation nor by any of its members, but by the attorney-general, to restrain by injunction the unauthorized exercise of a franchise.
The chancellor (Kent) refused to entertain jurisdiction of the case, upon the ground that the exercise of banking business without legislative authority was an offense, for which the offending party was liable to indictment; and that there was a complete remedy in the common law courts, by information in the nature of a quo warramto.
In that case the learned chancellor took occasion to use the following language: “ I admit that the persons who, from time to time, exercise the corporate powers, may, in their character of trustees, be accountable to this court for a fraudulent breach of trust, and to this plain and ordinary head of equity the jurisdiction of this court over corporations ought to be confined. Thus, for instance, if the directors of the Utica Insurance Company were to appropriate the funds or capital of the company to their own private emolument; or if, disregarding the business of insurance, they were to divert the funds to the destruction of that object, by making roads and canals, or building theaters, or churches, I have no doubt this court would have a right, and would be bound, to interfere and check the abuse. But when the question is whether a corporation has forfeited its charter, or has usurped a franchise, or has broken a penal law, the case is widely different. This court is not the proper tribunal to sustain the prosecution or to inflict the punishment.” Attorney-General v. Utica Ins. Co., 2 Johns. Ch. 370.
In the case of the Attorney-General v. Bank of Niagara, an information in the nature of a quo wcvrramto had been filed in the supreme court against the corporation for the purpose of vacating and annulling their charter.
Having filed this information, the attorney-general presented his bill in the court of chancery for an injimction *147 to restrain the corporation from issuing notes, receiving deposits or making discounts till the further order of the court. In refusing to entertain jurisdiction, and alluding to the case of the Attorney-General v. The Utica Ins. Co., Chancellor Sandrord said: “In the present case some facts exist and some points have been urged which were supposed to distinguish it from the case cited. An information in the nature of a quo wcvrrcmto has been actually filed, and is now depending in the supreme court. In the case of the Utica Insurance Company, no such information was depending. I do not think this to be material. The question whether the company has forfeited its franchise or not is not yet determined, and that question can be decided only in the supreme court. This court cannot interfere in the aid of the supreme court. To do so would be to prejudice the question which is to be determined there.”
In 1825 the legislature of New York passed an act in which it is provided that whenever any incorporated bank is insolvent, and unable to pay its debts, or has violated any of the provisions of the act incorporating it, the attorney-general, or any creditor of the company, may apply by petition to the court of chancery, setting forth the facts and circumstances of the ease; and'that upon proof of insolvency of the company, or that it has violated the provisions of its charter, the court may by injunction restrain a further exercise of its franchises, and may appoint a receiver of its property.
Subsequent to the passage of this act, a bill was filed in the court of equity for an injunction, and the appointment of a receiver. In determining the application, the chancellor holds this language: “ This application must be considered as founded altogether on the 17th section of the statute of the 21st of April, 1825. The general jurisdiction of this court, as a court of equity, extends not to this case. 2 Johns. Ch. 371, and the late case of the Attorney-General v. The Bank of Niagara, in this court. *148 The power which the court is now moved to exert is the new power conferred by this act of the legislature.” Attorney-General v. Bank of Chenango, Hopk. Ch. 596.
In the case of Verflanck and others v. Mercantile Insurance Co. of New York, and J. Barker, 2 Paige Ch. 487, a bill was filed before the vice-chancellor in 1831. The complainants were stockholders of the Mercantile Insurance Company of New Tork. The bill alleged that the directors of the company were under the influence and control of Jacob Barker, who was largely indebted to the company, and who represented himself to be insolvent. The bill also set forth .various acts of the company and of Jacob Barker, which were alleged to be violations of the charter of the company, or injurious to the interests of the stockholders. Upon presenting the bill, the vice-chancellor granted an injunction restraining the president, directors, and other officers of the company, and the defendant Barker, from exercising any of .the privileges or franchises granted by the charter, and he also appointed a receiver of the property and effects of the corporation. Upon appeal, although the order of the vice-chancellor was reversed, for certain irregularities in the procedure, yet his jurisdiction to grant the relief sought was clearly recognized. But it was distinctively placed upon the provisions of the statute of 1825, before alluded to. In reference to this subject, the chancellor said:
“ This is a bill filed by stockholders to wind up the concerns of the corporation, on the ground of an alleged violation of the charter. In this respect it differs materially from the bills which have been frequently exhibited in this coiut, by stockholders, against the individual directors of the company, to restrain them from violating their trust. And it can, therefore, only be sustained as a statutory proceeding under the 39th section of that title of the Revised Statutes, which directs the manner of proceeding *149 against corporations, at law and in equity. That is the only provision I have been able to find, which authorizes a proceeding by a stockholder to enforce forfeiture of the franchises of the corporation, and to compel a distribution of the funds.”
In the case of Robinson v. Smith, 3 Paige, 222, a bill was filed by certain stockholders of the New York Coal Company against, the directors of that corporation, charging them with improper conduct in the management of then- trust, and praying discovery and general relief.
The action was commenced prior to the passage of the statute of 1825. In determining the case, Chancellor Walworth uses this language: “ I have no hesitation in declaring it as the law of this State, that the directors of a moneyed or other joint-stock corporation, who willfully abuse their trust or misapply the funds of the company by which a loss is sustained, are personally liable as trustees to make good their loss. And they are equally liable, if they suffer the corporate funds or property to be lost or wasted by gross negligence and inattention to the duties of their trust. Independent of the provisions of the Revised Statutes, which were passed after the filing of this bill, this court had jurisdiction, so far as the individual rights of the corporators were concerned, to call the directors to account, and compel them to make satisfaction for any loss arising from a fraudulent breach of trust, or the willful neglect of a known duty. To this extent, Chancellor Kent, in the case of the Attorney-General v. The Utica Insurance Company, admitted the court had jurisdiction, although he doubted the general powers of this court over the corporation itselfj to prevent an abuse of its corporate privileges.”
In the ease of Dodge v. Woolsey, 18 How. (U. S.) 331, Woolsey brought suit in chancery, in the circuit court of the United States for the district of Ohio, to enjoin collection of a tax assessed by the State of Ohio, on a Cleve *150 land bank, in which Woolsey was a stockholder, making Dodge, the tax collector, the directors of the bank, and the bank itself, defendants, and alleging that the State of Ohio had levied illegal taxes on the bank, and that the directors, admitting the illegality of the tax, refused to defend against it. Referring to the objections made upon the part of the defendants to the entertaining of the jurisdiction, the court says: “The first (objection) comprehends two propositions, namely: That courts of equity have no jurisdiction over corporations, as such, at the suit of a stockholder for violations of the charter, and none for the errors of judgment of those who manage their business ordinarily. There has been conflict of judicial authority in both. Still, it has been found necessary, for prevention of injuries for which common-law courts were inadequate, to entertain in equity, such a jurisdiction in the progressive development of the powers and effects of private corporations upon all the business and interests of society.”
Allen v. Curtis, 26 Conn. 457, was an action on the case by a stockholder against the directors of the bank. The declaration alleged that the directors did not manage and conduct the affairs of the bank in a skillful and prudent manner, but that they willfully and designedly managed in an unskillful, careless and reckless manner, making false entries in the books of the bank, loaning money without security, etc.; whereby the bank became insolvent, and the stock of the plaintiff wholly worthless, and a total loss. The court, after holding that the action was not maintainable at law, proceeded as follows:
“ The entire duty of the directors growing out of the agency is owed to the bank, which, under the charter, is the sole representative of the stockholders, and the legal protector and defender of their property. Nor is any other protector or defender necessary, until the bank shall neglect its duty in refusing to call the directors to account, in which event, upon a case properly stated, and with proper *151 parties before tbe court, a court of egvAty may gr amt relief according to the existing exigency. * * * * If for any cause, the corporation is unable to bring suit, or if, through fraud or collusion, the directors refuse or neglect to bring suit in the corporate name, and will not seek redress, a ground will be laid for invoking the interposition of a court of equity.”
In the case of Peabody v. Flint, 6 Allen, 52, it was held that a minority of the stockholders of a corporation may maintain a bill in equity, in behalf of themselves and the other stockholders, for conspiracy and fraud whereby their interests have been sacrificed, against the corporation and its officers, and others who participate therein. And in the case of March v. Eastern R. R. Co., 40 N. H. 548, it was held that a minority of the stockholders in a corporation have a remedy in chancery against the directors and against the corporation, and against all others, whether individuals or corporations, assisting or confederating Avith them, to prevent such corporation and the directors thereof from making any misapplication of their capital or profits, which may result in lessening the dividends of stockholders or the value of their shares, if the acts intended to be done create what in law is denominated a breach of trust or duty. See also Angelí & Ames on Corporations, § 312.
These cases sufficiently indicate the general Anew which the courts have taken of this interesting question. A little attention to them will discover that, although apparently in conflict, they are easily susceptible of reconciliation. Those of them in which the jurisdiction of equity is denied, are cases in which that jurisdiction was invoked for the purpose of depriving the corporation of its franchises, winding up its affairs, and distributing its assets; those in which it is recognized, are case3 in which proceedings were instituted on behalf of stockholders, against the officers of the corporation, for fraudulent misapplication of funds, or *152 breach of trust in the discharge of official duties. They are not only consistent with themselves, but in harmony with the general doctrines of equity jurisprudence, which forbid the interposition of courts of equity in cases where the law affords ample relief, but always concede it for the enforcement of trusts and the prevention of frauds. The doctrine best sustained by authority, and most in consonance with reason and justice, seems to be that courts of equity, aside from statutory provisions, do not exercise a jurisdiction over a corporation, as over a partnership, to dissolve it and distribute its assets; but that it will afford a stockholder relief from the malfeasance of those intrusted with the management of the corporate business. Whether the jurisdiction of the court was properly invoked and exercised in this case will be hereafter further considered.
2_appointMiver^invacation. II. It is claimed that the judge had no authority to appoint the receiver in vacation, and that the case does not com© within the provisions of section 3419 of tii© Revision. We are of opinion that where a case is properly made, and the circumstances require or justify the appointment of a receiver, the said section authorizes the judge to make such appointment in vacation. Without such authority there would be a great defect in the administration of the law.
3. — appoint-notice. III. It is further urged that the receiver was not properly appointed, without notice to the parties interested. The general rule is that a proceeding so vitally affecting the interests of parties should not, except under, peculiar circumstances, take place without notice. In regard to this question, Chancellor Walworth holds the following language: “ By the settled practice in ordinary suits a receiver cannot be appointed, ex pcwte, before the defendant has had an opportunity to be heard in relation to his rights, except in those cases where he is out of the jurisdiction of the court, or cannot be found; or where, from- some other reason, it becomes absolutely *153 necessary for the court to interfere before there is time to give notice to the opposite party, to prevent the destruction or loss of property. Formerly it was never done until after answer. In every case where the court is asked to deprive the defendant of the possession of his property without a hearing, or an opportunity to oppose the application, the particular facts and circumstances which render such a summary proceeding proper should be set forth in the bill or petition on which such'application is founded.” Verplanck v. Mercantile Ins. Co., 2 Paige, 450. To the same effect, see, also, Devoe v. R. R. Co., 5 id. 521; Sandford v. Sinclair, 8 id. 373; Gibson v. Martin, id. 481; Ogden v. Kip, 6 Johns. Ch. 160.
The petition in this case alleges that plaintiffs verily believe that if notice of this application be given, the books, records and papers of said bank will be so falsified or spirited away that they cannot ascertain the said frauds.
This allegation does not conform to the rule as recognized in the case above referred to, which is, that where a receiver is appointed without notice, the pcurticula/r facts a/nd ci/rcwnstances which render'such a proceeding proper should be set forth in the bill or petition. In that case the chancellor further said: “ It would be felony in any of the individual officers to embezzle or spirit away the property of the institution without the consent of the board of directors. The court ought, therefore, to haye something more than the mere opinion of a witness, however respectable, to induce it to suppose such a direction would subject themselves to punishment for the violation of an order of the court, or that the officers of the' company would be guilty of felony, by embezzling the property without the consent of the directors, if the usual course of an order to show cause at a short day had been taken, and a temporary injunction in the mean time granted. That practice was adopted by the chancellor in the ease of the Franklin Bank (1 Paige, 85), and the same course has been pursued *154 by him in all subsequent cases.” In view of the allegar tions of this petition and the important interests involved, the receiver should not have been appointed without notice upon the parties adversely interested.
5--parties. IY. That the Davenport Savings Institution was a necessary party to this bill, is fully maintained by the case of Verplanck v. Mercantile Insurance Co., ke£ore referred to. The plaintiffs seem to concede this by the aniendment to them petition, before the hearing of the motion to vacate the receivership, by which the corporation was made a party to the proceedings. It is claimed, however, that the amendment thus made does not cure the defect; that the order was void, and cannot be validated. As the point remaining to be considered disposes óf the case, it is not necessary to bestow upon this objection further notice.
6. — appointment oí reoeiver: bank, V. We come now to the consideration of the principal question in this case; whether, upon the merits, the order appointing the receiver should have been vacated, and the injunction dissolved.
The testimony taken upon the motion to vacate the receivership and dissolve the injunction is quite voluminous, covering more than one hundred and fifty pages of printed matter. If it were practicable, within the limits of an opinion, to do more than to set forth the general conclusions to which this testimony leads, it would rather tend to the production of confusion than the promotion of clearness. The material facts which it establishes are the following. The Davenport Savings Institution is an incorporated company doing business in Davenport.
Its affairs are conducted by a board of control, elected on the first Monday in January, in each year, by a majority of the stock voting. From the board of control the president and vice-president are elected; and such other officers as may be necessary in carrying on the business are appointed. The committee of investment, chosen by the board of *155 control, consists of the president, vice-president, treasurer and four members of the board of control. The First National Bank of Davenport is also an incorporated company, the stockholders of which are nearly the same as those of the Davenport Savings Institution, and in whose building the business of the Savings Institution is conducted. The property of the Savings Institution is kept in the vaults of the First National Bank. At the time of the appointment of the receiver, the officers of the First National Bank were, Ira M. Gifford, president; J. E. Stevenson, vice-president; James Armstrong, Thomas Scott, James Thompson, W. H. Decker, August Steffer, John Schmidt and EL R. Claussen, directors; and those of the Savings Institution were, Ira M. Gifford, treasurer; Edwin Smith, president; James Armstrong, vice-president; Hugo Schmidt, secretary; the president, vice-president, treasurer, August Warnebold, and James Thompson were the members of the investment committee; and August 'Warnebold, L. L. Ochs, Ira M. Gifford, Hugh Carnahan, Hugo Schmidt, James Armstrong, Edwin Smith, James Thompson and Louis Haller, constituted the board of control. The capital stock of the Savings Institution was $500,000, divided into shares of $100 each; the paid up capital $10,000, and the deposits, $222,374,i¡$j-.
Some time in November, 1868, the officers of the Davenport Savings Institution effected a loan from the First National Bank of $20,000, depositing, as collateral security therefor, $20,000 of ITnited States bonds.
The money thus borrowed, and the deposits at the time on hand, were loaned in various sums to Stevenson & Carnahan, James Thompson, ~W. H. Decker, James Armstrong, Thomas Scott, August Steffer, E. Smith, H. R. Claussen and Ira M. Gifford, the entire amount of loan being $51,735
The parties to whom these loans were made, executed to the Davenport Savings Institution, notes in the following *156 form: “Davenport, Iowa, November 16, 1868. On demand, after date, I promise to pay to tbe order of tbe Davenport Savings Institution, $-, at the office in Davenport, Iowa, for value received, with interest at five per cent; and I do hereby agree that in case this note shall remain unpaid for thirty days after demand made, the holder hereof may sell the collaterals deposited to secure the same at public auction, after giving thirty days’ notice of the time and place of sale, by posting thrée written notices in the city of Davenport. But it is expressly understood and agreed by and between the parties to this obligation and their assigns, that the collaterals hereto annexed shall not be sold, as above stipulated, until the same will bring a sum sufficient to pay this note in full, with all attending costs of sale.” The usual rate of interest for .time loans was ten per cent, and of demand loans five percent. The money thus borrowed was used in the purchase of stock of the First National Bank, and the Davenport Savings Institution, and the stock so purchased was deposited as- collateral security for the loan. These notes were* not placed upon the list of bills receivable, nor upon the books of the savings institution, until January 1,1870, nor was any entry made upon the books showing the transaction in regard to the $20,000 of United States bonds, until the 31st of December, 1869, when the bonds were «returned. The note of Decker was paid December 28, '1869.; those of Stevenson & Carnahan and Thompson were paid January 1, 1870; and the remaining notes were paid to-the receiver January 10, 1870.
The plaintiffs, were desirous of securing a representation on the board of control; and the loan of upward of • $51,000, before alluded to, was effected in order to enable -those in possession of the savings institution to control votes enough to secure a continuance in office.
Sometime in June, 1867, Gifford, Armstrong, Scott andv Stevenson effected a loan on call, from the Union National *157 Bank of Chicago, of $15,000, at four per cent interest. At the time of this loan the First National Bank of Davenport was depositing with the Union National Bank of Chicago; rarely having as small a sum as $15,000, and often, much more than that amount on deposit, for which interest, at the rate of four per cent, was allowed. After this loan, and until December, 1867, the Union National Bank allowed the First National Bank no interest on $15,000 of its deposits. This interest, amounting to $3,000, was equal to the interest for the same period due the Union National from the four parties above named, on their note of $15,000. After December, 1867, the Union bank deducted, each day, $15,000 from the deposits of the First National, and computed the daily interest on the balance only. In this way, as before, the interest on $15,000, which should have been paid to First National Bank of Davenport, balanced the interest which should have been paid by those parties on their note of $15,000 to the Union Bank of Chicago.
There was a fund in the First National Bank known as the Ira M. Gifford trustee fund. Armstrong bought ten shares of bank stock, and sold them at a profit of $50 a share. Eldridge and Ochs borrowed $30,000 from the, First National Bank, on the verbal guarantee of Gifford. With this they bought land for Gifford, which was sold at a profit of $1,200 or $1,400. The profits on this bank stock and land transaction went to this trust fund. This fund was further accumulated by applying to it a portion of the discount upon paper bought by the bank. It is somewhat difficult to determine the purpose for which, this fund was accumulated. It seems that a part of it was used to pay the county treasurer interest on deposits of county money, and a part went to pay losses sustained by the bank through bad debts. Some, at least, of the makers of the notes for the $51,000 loan, understood that this fund was to be used toward the liquidation of those notes. At one *158 time it was proposed to so use it; but it does uot appear that any portion of it was so appropriated. These are the leading facts established by the testimony submitted. That those interested with the management of the institution were solely actuated by a desire to promote its best interests can scarcely be maintained. If it were true, as claimed, that, at the time of making the loan before alluded to, the bank had loaned, on time, all that could prudently be so invested, and that the lalcmee was loaned on good security at five per cent, payable on call, in order that the same might be within command to meet any exigency which might arise, the transaction would be not only proper but commendable. But the borrowing of $20,000 on a pledge of United States government bonds, and loaning it to themselves at five per cent, to be used in purchase of bank stock at a high rate, for the purpose of retaining control of the institution, upon no other security than the stock in which it was invested, with a stipulation that the security should not be sold until sixty days after demand of payment, and not then unless it would sell for enough to satisfy the debt, can be approved only by that charity which suifereth long and thinketh no evil. And yet we are constrained' to the belief that the disorder did not render necessary or proper the violent remedy adopted. It will be observed that the transactions in regard to the $15,000 loan, and the trustee fund, have sole reference to the First National Bank. But, were it otherwise, the views which we entertain would not be modified. An injunction, restraining the officers from a continuation or repetition of the conduct complained of, and an order compelling them to account to the institution or the stockholders for any losses sustained by their malfeasance, would have furnished adequate relief without any loss or injury to the corporation.
It needs but little experience to know that an order placing the affairs of this corporation under the control of a receiver would, in a short time, as effectually work its *159 destruction as an order déclaring its franchises forfeited. The business in which it was engaged is profitable only as it commands public confidence. This destroyed, its “ occupation is gone.”
On the 1st day of January, 1870, the institution had deposits amounting to $222,374.13. Nearly all of this sum was invested, there being only $19,114.64 on hand. Capital is easily alarmed, and ever on the alert. The natural and almost inevitable consequence of the appointment and continuation of a receiver, is a withdrawal of these deposits. This necessitates a conversion of the securities, perhaps at great loss, and thus not only are the profits of the institution destroyed, but its very life is imperiled. By such a course, if the franchise of the corporation is not taken away, it is rendered not worth'retaining. And these results, by which the innocent stockholder, unheard, is deprived of his property, follow simply in consequence of the malfeasance of some of the officers of the corporation. A proceeding productive of such consequences ought not to be resorted to while milder, yet effective, remedies are available.
In our judgment, upon the testimony submitted, the order appointing the receiver should have been vacated.
The injunction also should have been' dissolved. It simply prevents the stockholders from expressing their preference as to the board of control, without any possible attendant benefits. The articles of incorporation provide that any failure on the part of the stockholders to elect a board of control at any annual election shall authorize the board to continue in office until their successors are duly elected. The effect of the injunction is to continue the present incumbents.
The order refusing to vacate the receivership and dissolve the injunction is
Reversed.