GIBSON *et al. v.* THORNTON *et al.*

1. Where at the interlocutory hearing of a petition for injunction and receiver the judge refused to grant the injunction or to appoint the receiver, and the case was brought to the Supreme Court, where the writ of error was dismissed, and the plaintiffs subsequently filed an amendment, it was not error for the court, when the case was called, in term, for trial, upon motion of the defendants, to strike so much of such amendment as consisted of a detailed statement of all that had previously transpired in the case, together with allegations which, in effect, simply charged that the defendants had, since the interlocutory hearing, continued to pursue the same course of unlawful conduct with which they were charged in the previous pleadings of the plaintiffs.
2. Where plaintiffs amend their petition after a demurrer thereto has been overruled by the court and the defendants have answered, such amendment, unless it materially changes or varies the cause of action as set forth in the petition, does not reopen the case to another demurrer.

Argued October 19, 1898. — Decided July 26, 1899.

Petition for injunction. Before Judge Butt. Talbot superior court. March term, 1898.

Thomas N. Gibson and Walter K. Dennis, in behalf of themselves and such other stockholders of the Talbotton Railroad Company as might become parties, and for the use of the railroad company, brought their petition for injunction and receiver, and for other relief, against said company and against S. W. Thornton, C. J. Thornton, and W. J. Thornton as individuals and as officers and directors of the same. The petition makes the following allegations: Said company is a corporation under the laws of this State, doing business as a common carrier of passengers and freight. The railroad is seven miles

long, running from Talbotton to Bostick. The company was organized under its charter (Acts 1872, p. 370) in 1880, and the road was completed in 1881 and has since been continuously operated. The capital stock subscribed and paid in is 348 shares of the par value of $100 each. Of this Gibson owns 63 shares, Dennis 15 shares, and the balance is owned by various persons including said three Thorntons, which three own a majority of the stock. There is a bonded indebtedness upon the road of $25,000, bearing 6 per cent. interest payable semi-annually. The bonds were issued on July 1, 1881, and run for twenty years. They are secured by a first mortgage on the road and rolling-stock, and constitute a first lien on the road. The company has by-laws which provide for a board of directors who elect a president, secretary and treasurer, and superintendent, and according to the by-laws they are required to make annual reports of the financial condition of the company to the stockholders. The by-laws also require that there shall be a finance committee composed of three stockholders or directors to whom the secretary and treasurer shall submit monthly statements itemized, that the same may be audited. The by-laws also require that the treasurer shall give a good and sufficient bond for $5,000, conditioned for the faithful performance of his duties and accounting for all funds which go into his hands. In 1892 the three Thorntons obtained a majority of the stock, since which time they have elected the directors and have had full control and management of the road. While Gibson was elected a director during said time, he has had no control or voice in the management. No meetings of the directors were held, except once a year, when the stockholders elected the directors, at which time nothing was done by the board but to elect officers; and the entire control and management of the road has been in the hands of S. W. Thornton who has held the office of superintendent, secretary and treasurer. Gibson as a director has repeatedly asked that reports be made of the condition of the company, and has urged that the road be kept in good condition and that dividends be declared to the stockholders; all of which S. W. Thornton has refused, and has refused to give any satisfaction to pe-

titioner of the condition of the company's property, or to make any report of his actings or doings.  Gibson held the office of director with the view and purpose of being some benefit to the stockholders; but after repeated efforts on his part to exercise some influence for the good of the corporation, he found that he was being used merely as a figurehead, and he resigned the office of director.  There are really but three directors of the company, the three Thorntons, two of them being brothers, and W. J. being a son of S. W. Thornton.  The latter is superintendent, secretary and treasurer; the former is the depot agent at Talbotton; and C. J. Thornton is the president of the company.  Of the other two nominal directors, S. Waxelbaum resides in Macon, is not a stockholder, and has never attended a meeting of directors; and McCormick Neal is a resident of Florida, has never acted as a director nor attended a meeting of directors, nor has he been notified of his election as such nor signified his acceptance of the office.  While 177 shares of stock are claimed by C. J. Thornton, the same is not his property but is that of S. W. Thornton, and is hypothecated for a large sum of money obtained by or for him.

Petitioners being dissatisfied with the way the company was being managed, and having failed to get any information from S. W. Thornton who has had entire control of its property for three years, demanded of him the right to examine its books. They saw that the road was not being kept in good condition, nor was its rolling-stock; they were informed that the few expenditures made for it for two or three years had not been paid for; and they were satisfied that its business warranted that it be kept in first-class condition, and that from its earnings dividends should be declared to the stockholders.  To their demand S. W. Thornton replied that he would first have to consult with C. J. Thornton.  After waiting for some time they again made their demand, and S. W. Thornton put them off, saying that the books had not been posted up.  After waiting a reasonable time they renewed the demand, and he submitted to an examination of the books.  They find that the same have been so badly kept that it is impossible, without the aid of experts and aliunde testimony, to arrive at anything like

the true financial condition of the company. No reports are made to the finance or auditing committee as required by the by-laws, nor has such committee been appointed as required; instead of having a committee of three, there are only two, S. W. and W. J. Thornton, who are to pass upon their own reports, but in fact no reports are made. Few if any tickets are sold for passenger fares, but the management allows the fares to be collected on the train and reported in gross. The books show the payment of considerable sums for which there are no vouchers; and S. W. Thornton refused to produce such vouchers when demanded. The books show that there is a large sum of money on hand, and to inquiry as to this said Thornton replied that it was on paper, that the road did not have it, but it was owing to the road for freight, etc. The treasurer is not under bond as required by the by-laws. He fails and refuses to pay the company's debts as they become due, viz., the interest on the bonds, the monthly balances due the Central R. R. Co., the debts contracted for passenger-coach and other supplies, and the laborers and employees; but postpones them from time to time and pays interest thereon, although he has on hand sufficient money to pay them, but instead he uses the money of the company in his private business, thereby injuring the credit and increasing the liability of the company. By virtue of the ownership of a majority of the stock, and in collusion with his brother and son, S. W. Thornton is operating and using the railroad, its property and franchises, in his own interest and not in the interest of the corporation or its stockholders; he has converted said property to his own use entirely; all of the proceeds of the road go into his private business and are used by him, — this including the earnings of the road over and above all operating expenses for the past three years, and the large sums due the Central R. R. Co. for freights collected, he failing to settle with said company monthly as is his duty. He has refused on demand to produce the vouchers and receipts showing settlements of balances between the Talbotton R. R. Co. and the Central R. R. Co. The stock-book and certificate-book are illegally and improperly kept. Many persons appearing on the stock-book as shareholders are not such;

their stock has for years been held by C. J. or S. W. Thornton, but their names are allowed to remain on the books, in violation of the by-laws of the company, and for the purpose of concealing from other stockholders who are real stockholders in the company. All said stock is voted at the annual meetings by S. W. Thornton who claims to hold the proxies. The books show that the interest on the bonds which fell due July 1, 1895, has been paid; but S. W. Thornton failed and refused on demand to produce the vouchers showing this payment, and petitioners are informed that said interest was not paid and is owing by the company. Similar allegation is made as to $500 purporting to have been paid for a passenger-coach.

Petitioners called on S. W. Thornton for all the books of the company, including those of the secretary and treasurer, and vouchers for all the payments made by him during the past three years. He failed and refused to produce any; and all the books submitted were such as were kept by W. J. Thornton, the agent at Talbotton. In allowing them the privilege of examining the books, said Thornton restricted them to such times as suited his convenience; he would not allow them to examine them except in his presence, nor allow the books taken out of the office; and thereby made it very difficult for them to make a thorough examination. As an illustration of the manner in which the books furnished them are kept, it appears therefrom that the cash balance on hand on June 30, 1893, was $2,464.84; yet the cash balance brought forward July 1, 1893, the beginning of a new fiscal year, was only $273.57. Correcting errors in balances brought forward since 1892 shows that the treasurer now has on hand in net earnings of the road $8,384.94, when his books make it appear that he has only $5,300.94. When called on to explain where the money was, he answered that the showing made by the books is only a paper showing; that it was for accounts and freights due the road, which had not been paid. His management of the property has greatly injured and damaged its credit and financial standing. The stock of the company was worth par only a few years ago; now there is no market for it at all, and petitioners' holdings are worthless, although they invested in this stock in

good faith.   Notwithstanding S. W. Thornton had ample funds of the road on hand, he permitted, in the fall of 1892, freight balances amounting to about $5,000 due the Central R. R. Co. to stand charged against the Talbotton R. R., and in October, 1894, nearly half of this was still unpaid, and the same or a portion of it may still be unpaid.   The Central R. R. Co. frequently threatened suit, and finally required weekly settlements, instead of monthly as theretofore.   He used said sums so withheld for his own private business, in addition to the money of the Talbotton R. R. Co., which he was so using at the same time, when he was insolvent and under no bond whatever.   Notwithstanding the books show that the company has had on hand, at all times during the past five years, more money than was necessary for its operation, and that S. W. Thornton withheld the sums before mentioned, yet it appears therefrom that he loaned the company in July, 1891, and June, 1892, $2,000 at twenty per cent. interest; which loan was made and interest paid without any authority of the board of directors and without the knowledge of petitioners or other stockholders; and the books show that the company did pay him twenty per cent. on said sum.   It is therefore charged that the three Thorntons have conspired to injure and defraud the company and its stockholders.   Though Gibson was for several years the nominal president as late as May, 1895, he was not permitted to have any voice in the management of the affairs of the road, and was not consulted in regard thereto, nor was he ever informed of the condition of its finances nor furnished with a report of its business; defendants entirely controlling and managing it.   He made repeated efforts to have them cooperate with him in administering the affairs and finances in the interest of all the stockholders, which they refused to do. He retained his position for the purpose of ultimately securing the rights of the minority stockholders; but in his opinion defendants elected him to the office for the purpose of handicapping him while they operated the road for their private interest.   He had confidence in his being able to accomplish something in this way until the spring of the year 1895, when he became convinced that defendants were determined to use the

road for their own interest and not for the benefit of the owners; whereupon he at once resigned the office of director. The company is illegally organized, and is without any legally elected directors as required by the charter and by-laws. At the meeting held in May, 1895, a majority of the stock was not legally represented; only 228 shares of stock purported to be represented, and of this number S. W. Thornton claimed to represent 124 shares as proxy for six persons (naming them) who did not then own and had not owned any stock in the company, directly or indirectly, for more than two years, and none of them had given him a power of attorney to represent them in the meeting. Petitioners have made no request of the directors of the corporation to bring suit against said defendants, for the reason that the defendants constitute the board of directors and are guilty of the wrongs complained of.

By amendment it is alleged : Within the last two years the three Thorntons, while occupying the position of directors of the company, and with intent to defraud petitioners and other stockholders and the public, illegally issued a large number of certificates, representing two hundred or other large number of shares of stock of the company, to S. W. and W. J. Thornton, who hypothecated them to obtain money or credit for the firm of S. W. Thornton & Son. Said certificates were from the stock-book of the company on certificates detached ; no memorandum of the same was left on the stock-book, but defendants fraudulently concealed the fact from the stockholders of the company, and in order effectually to conceal it, purchased another stock-book and from the new book issued said certificates; and when petitioners examined the books in July, 1895, defendants failed to allow them to see this last stock-book, but fraudulently concealed it. The issue of said stock created a large liability on the company. After the filing of the original petition in this case, and before the books of the company were examined by Fowler (who was appointed by order of the judge for the purpose) defendants fraudulently changed and altered a great many entries on the books, which may be seen by inspection. Wherefore it is averred that it is not safe to petitioners' interest that defendants should have

charge of the property. By further amendment eight other persons claiming to own about forty shares of stock were made parties plaintiff; and the following allegations were made: John H. Dennis being indebted to the railroad company, and W. K. Dennis being so indebted, in order to pay the same, and with the consent of the directors of the company, W. K. Dennis and P. E. Dennis transferred to S. W. Thornton, the secretary and treasurer of the company, seventeen shares of its capital stock, and the certificates so transferred thereby became the property of the company. S. W. and W. J. Thornton, who were engaged in mercantile business under the name of S. W. Thornton & Son, fraudulently converted said seventeen shares to their own use, and hypothecated them to merchants in Macon as collateral security for debts due by said firm. They have within the past two years hypothecated a large number of certificates of the stock with various merchants in Macon, Atlanta, and elsewhere, aggregating $35,000 or other large sum. The same was fraudulently, illegally, and without consideration issued to S. W. Thornton or S. W. Thornton & Son by themselves or by C. J. Thornton, the president, and S. W. Thornton, the secretary and treasurer. Petitioners are informed that the stock standing in the name of C. J. Thornton on the books of the company (which for the most part was transferred to him on said books since the filing of this suit) is not his property but that of S. W. Thornton; that in 1885 S. W. Thornton was the owner of a large number of shares, and becoming embarrassed in business, he transferred the same to O. B. Stevens of Dawson, Ga., and M. L. Patterson of Alabama, and while so embarrassed he failed, and to defeat his creditors he had said stock transferred to C. J. Thornton who has since held it in his own name; and that at that time said stock was readily worth par, and during all the time since 1886 S. W. Thornton has managed and controlled it in his own interest, and has received all the profits from it. Notwithstanding the guilt of S. W. Thornton (as admitted in an answer of file in this case) in wrongly and fraudulently issuing stock, he and his brother and son, as directors, met on September 28, 1895, and proceeded to elect A. E. Thornton, a son of C. J. Thornton, as a director in

place of S. Waxelbaum who was claimed to have been elected
a director in July, 1895, but refused to serve; and said so-
called directors have since continued to allow S. W. Thornton
to hold the offices of superintendent, secretary and treasurer,
thereby condoning his fraudulent acts.　Though the name of
McCormick Neal appears on the books of the company as hav-
ing been elected a director in May, 1895, he was not notified
by any official of the company of his election until the follow-
ing September, when S. W. Thornton notified him that there
would be a meeting of the directors on the 28th of that month.
He has never consented to act as director, nor will he do so un-
der existing circumstances.　By reason of holding the offices
stated, S. W. Thornton has entire control and management of
the business of the company and of its books and money, which
he can and does keep and manipulate as he pleases and as his
own.　He makes all contracts for the company, and hires
and discharges employees at his pleasure.　C. J. Thornton is
president only in name and by courtesy; he has no control
over the road or its business, and gives little or no attention to
its affairs; although for nearly ten years he has nominally been
the owner of nearly $10,000 of stock, and for some time of over
$20,000 worth, he has held no office of profit nor drawn any
dividends; but he allows his brother and nephew to hold the
offices of profit, use the money of the company as their own,
convert the stock to their own use, and issue and use fraudu-
lent stock for their private gain.

The defendants demurred and answered.　The court over-
ruled the demurrer, and, after hearing evidence, refused the
application for injunction and receiver.　The case came to the
Supreme Court, where the writ of error was dismissed because
the judge had failed to sign the bill of exceptions within the
time required by law.　Petitioners then filed an amendment,
setting forth the proceedings previously had in the case, and
alleging as follows: By the dismissal of their bill of exceptions
petitioners were deprived of their right to have the judgment
of the court below reviewed and errors corrected, all of which
was without fault or negligence on the part of petitioners or
their attorneys.　The evidence introduced upon the hearing is

embodied in the brief of testimony approved by the court and of file as a part of the record. It was shown by abundant evidence, in support of allegations in the petition, that petitioners were stockholders at the time of and prior to the filing of the petition; that defendants S. W., C. J., and W. J. Thornton were the owners of about 219 shares of the capital stock of the Talbotton Railroad Company, and that petitioners owned the remainder, or about 129 shares, all of which were of the par value of $100 per share; that the defendants were in absolute control of the railroad company; that C. J. Thornton was president and a director, S. W. Thornton a director and secretary and treasurer and superintendent, and W. J. Thornton a director and the agent and bookkeeper of the company; that S. W. Thornton and C. J. Thornton are brothers and W. J. Thornton is a son of S. W. Thornton, and that they constituted a majority of the board of directors; that the other two directors were A. E. Thornton, son of C. J. Thornton, and A. C. McCoy, and that the last two were elected between the time of the filing of the petition and the hearing, by the first three mentioned directors, to fill the vacancies of two who had never been notified of their election and who had not served prior to the filing of the petition; that false entries had been made on the books of the company, and changes in entries made to cover illegal and fraudulent transactions; that S. W. and W. J. Thornton had been guilty of converting the property and money of the company to their own use; that S. W. Thornton and W. J. Thornton had been guilty of using and hypothecating illegal and fraudulent certificates of the stock of the company to an amount exceeding $20,000 of the par value of the stock; that S. W. Thornton had been guilty of forging the name of T. N. Gibson, a former president of the company, to a number of false, illegal, and fraudulent certificates of stock, and after thus forging his name to stock aggregating $21,000 at par value, uttering the same and issuing the same as collateral security for debts of S. W. and W. J. Thornton; that the defendants fraudulently mutilated certain certificate or stock books of the company, and, after the filing of the original petition and before the final hearing, they either destroyed one of the books or refused to

obey the order of the court to produce the same, and that the book contained evidence very material to plaintiffs' suit; that the defendants failed and refused, although ordered by the court to do so, to furnish evidence or to disclose the time when a certain certificate-book had been purchased or from whom it had been purchased, or when purchased or how paid for, and to whom paid, and where published or when published, or to produce any invoice or furnish any voucher for the payment of same, or to show any entry whatever on the books of the company concerning said book, this evidence being material to establish when certain stock-certificates which were admitted to be fraudulently issued were in fact issued, and for the purpose of establishing the fact of forgery on the part of S. W. Thornton, the question being an issue between the plaintiffs and the defendants; that the defendants, while in control of the company, had borrowed money and paid usurious rates of interest, from one of the defendants, at a time when, according to the books of the company, it had a surplus of cash on hand, besides having in its treasury between two and five thousand dollars belonging to the Central Railroad and Banking Company, which they were withholding from that company, though often demanded; that the defendants had injured and damaged the credit of the company by failing and refusing to pay its debts, when they, as officers, had the money with which to pay same, had suffered tax executions to be issued time and again against it, and had paid large sums by way of interest; that S. W. Thornton had entire control and management of the affairs of the company, and had had for a number of years, and that his son was his bookkeeper and employed under him.

Notwithstanding these facts, which appeared on the hearing in March, 1896, at a meeting of the stockholders held in May, 1896, the persons holding and controlling a majority of the stock of the company, viz., S. W. Thornton, C. J. Thornton, W. J. Thornton, and A. E. Thornton, elected S. W. Thornton, C. J. Thornton, and W. J. Thornton, directors, these three constituting a majority of the directors, and elected A. E. Thornton, son of C. J. Thornton, and A. C. McCoy directors, McCoy being an employee of S. W. and W. J

Thornton, and being made eligible to hold said office by one of the defendants transferring to him certain stock without consideration. The board of directors so elected, with knowledge of the many wrongs, illegal transactions, and fraudulent and criminal conduct on the part of certain of the defendants and especially of S. W. Thornton, re-elected C. J. Thornton as president of the company and S. W. Thornton secretary, treasurer, and general superintendent and manager of the company, and continued them in said positions of trust and confidence in the management and control of said property, and S. W. Thornton appointed W. J. Thornton the agent and bookkeeper of the company, and since that time they have been and are in full control and management of the company, and S. W., W. J., and C. J. Thornton have been mismanaging the property and converting it to their own use. To conceal their fraudulent conduct they made false entries on their books, when they saw proper to keep books. Since December, 1896, or January, 1897, they have kept no books showing receipts and expenditures, but have kept the same on slips of paper which they could easily destroy or renew to suit their convenience, or to meet such complaints as might be made. Upon these slips false entries have been made, and they failed to account for considerable of the earnings of the company on the slips. They fail and refuse to promptly pay the debts contracted for the company, and force creditors to wait, and, upon threats of suit, pay interest. They fail and refuse to pay the employees of the company, although the company has a considerable sum in the hands of the treasurer, or should and would have, but for the fact that said defendants have converted the same to their own use. The continued mismanagement of said company's affairs by said officers has resulted in the total destruction of the value of petitioners' holdings. Whereas their stock was reasonably worth its par value when said defendants obtained control, it is now, and was at the time of the commencement of this suit, worthless in open market. (Paragraphs 13 and 14. By said mismanagement on the part of said defendants, said corporation has been rendered insolvent, and if continued in their control the property

of the company will not be sufficient to pay the principal of the bonds when they fall due in 1901. Petitioners confidently believe, if the property should be managed by careful and prudent men, it can again be made valuable to the owners. The acts complained of against S. W., W. J., and C. J. Thornton, directors, are and have been beyond the charter powers of the corporation. The fraudulent transactions above set forth have and will result in serious injury to the company and to its other shareholders. Said defendants, constituting a majority of the directors and in control of a majority of the stock, are and have been acting in their own interest in a manner above set forth, destructive of the company's interest and of the rights of the other shareholders, and are, as above set forth, oppressively and illegally pursuing, in the name of the corporation, a course in violation of the rights of the shareholders, which can only be restrained by a court of equity.) Petitioners pray that the defendants S. W., W. J., and C. J. Thornton be enjoined from in any manner interfering with the affairs of the company; that a receiver be appointed to take charge of the railroad and its assets; that petitioners have judgment against said defendants for the damages arising upon a depreciation of their stock on account of the wrongs and mismanagement of the defendants, and they reiterate the prayers for relief as contained in their original and amended petitions. A motion to strike this amendment was sustained, except as to the thirteenth and fourteenth paragraphs, and the plaintiffs excepted.

To the petition as amended the defendants offered a demurrer, to the consideration of which the plaintiffs objected, because: (1) the defendants had at previous terms of the court filed their answers to the petition and the amendments thereto; (2) the court had previously overruled the demurrer filed by the defendants; and (3) the last amendment offered was not of such materiality as opened the entire case for demurrer. The court overruled these objections and allowed the demurrer filed, and the plaintiffs excepted. The demurrer was upon the following grounds: (1) There is no equity in the petition as amended. (2) The facts alleged are not sufficient to entitle

the plaintiffs to the relief prayed for.   (3) It appears that the plaintiffs have an adequate remedy at law against all of the persons against whom relief is prayed.   (4) If the plaintiffs have been injured by the fraudulent issue of stock and other acts of mismanagement and fraudulent conduct charged against S. W. Thornton, he is alone responsible individually therefor; plaintiffs have an adequate remedy at law as against him, and said conduct furnishes no ground for the relief prayed against the Talbotton Railroad Company and the other defendants. (5) It appears that the plaintiffs have made no application to the Talbotton Railroad Company, or to the president and board of directors thereof, for the redress of the grievances complained of; no sufficient reason is set forth for the failure so to do; and there is no charge that the corporation and its board of directors have refused to take action in the premises. (6) It appears that the defendants C. J., S. W., and W. J. Thornton own a majority of the stock of defendant corporation and have a right to control the management of the same, and no sufficient reason is shown for the interference of the court in such management in behalf of the minority stockholders. (7) It appears from the amendment last filed that all the new matter alleged therein consists of transactions since the filing of the original petition, and that plaintiffs had no cause of action on account thereof at the time the original petition was filed.   (8) It appears from this last amendment that, since the filing of the original petition and the other amendment thereto, there has been an entire change in the management of the Talbotton Railroad Company, that a new president has been elected and two new directors chosen, and that there are no charges or allegations in the amendment or in the original petition to entitle the plaintiffs to the relief prayed for against the present management of the railroad company.   (9) It appears that the alleged acts of the defendants were known to and acquiesced in by the plaintiffs before the commencement of this suit, and the plaintiffs are barred by their own laches from any right to the relief prayed for.   (10) The petition is multifarious.   (11) There is a misjoinder of parties defendant.   (12) There is a misjoinder of causes of action.   (13)

Separate and distinct causes of action are alleged and separate and distinct relief prayed against separate and distinct persons and against a corporation, and against separate and distinct persons in their individual capacity. (14) It appears from the petition that T. N. Gibson, one of the plaintiffs, was the president of the Talbotton Railroad Company during the time of the alleged wrongful and fraudulent acts, and that he permitted the same to be done, and took no steps to prevent the same. The court sustained the demurrer, and the plaintiffs excepted.

*Persons & Son* and *Brannon, Hatcher & Martin,* for plaintiffs.
*J. J. Bull, C. J. Thornton, A. J. Perryman* and *McNeill & Levy,* for defendants.

FISH, J. In this case several amendments to the plaintiffs' petition had been offered and allowed prior to the amendment which they filed on the 13th of August, 1897. This last amendment had not been allowed by the court when the case came on for trial at the March term, 1898, and the defendants then moved the court to disallow and strike it. After argument upon this motion, the court ordered all of this amendment stricken except the 13th and 14th paragraphs thereof. Plaintiffs in error, in their bill of exceptions, allege that the court erred in disallowing the portion of the amendment which was ordered stricken. The stricken portions of the amendment consisted of a detailed statement of all that had previously transpired in the case, together with allegations in reference to the conduct of the defendant directors since the filing of the petition and the interlocutory hearing of the case. Its purpose seemed to be to obtain another interlocutory hearing of the application for injunction and receiver, upon the same pleadings and evidence which were before the judge when he denied the prayer for an injunction and refused to appoint a receiver; the plaintiffs claiming that they had failed to obtain a hearing in the Supreme Court upon their bill of exceptions to his decision to this effect, because of the failure of the judge to certify the bill of exceptions within the time prescribed by law. But no interlocutory hearing was ever had after this

amendment was filed, and when the motion was made to strike it the case was up for final trial in term.   Certainly to encumber the record with a circumstantial account of everything that had transpired in the case, from the filing of the petition to the dismissal of the writ of error in this court, could then answer no useful purpose whatever.   It mattered not then whether the judge at chambers had denied the application for injunction and had refused to appoint a receiver, or had granted both prayers of the plaintiffs.   The case came up then to be tried, de novo, upon all the pleadings previously allowed, and upon all competent evidence which might be introduced by the plaintiffs on the one side and the defendants on the other.   The interlocutory judgment was but temporary and provisional, and its force could only be operative from the time of its rendition until the case should be heard upon its merits and a final decree rendered therein.   Consequently all the allegations in the amendment with reference to the previous history of the case were, when the case was before the court for final trial upon its merits, useless and irrelevant.   In so far as the portion of the amendment which was stricken undertook to set up facts which had transpired since the interlocutory hearing, it failed to materially strengthen the plaintiffs' case as it was made by the petition and the amendments which had already been made thereto.   It in effect simply charged that the defendant directors had, since the interlocutory hearing, continued to pursue the same course of unlawful conduct with which they were charged in the previous pleadings of the plaintiffs.   It was, in this respect, a mere reiteration of the allegations which were already contained in the amended petition as it stood before this last amendment was filed.   The plaintiffs were not hurt when the stricken portions of the amendment were disallowed by the court.

2. After the court had allowed the plaintiffs to amend their petition by incorporating therein the matter included in the 13th and 14th paragraphs of this amendment, the defendants offered to demur to the petition as amended.   The plaintiffs objected to the consideration of this demurrer, "1st, because the defendants had, at previous terms of the court, filed their answers to

the petition and the amendments thereto; 2nd, because the court had previously overruled a demurrer filed and urged by the defendants; 3rd, because the last amendment was not of such materiality as opened the entire case for demurrer." The court overruled these objections, allowed the demurrer to be filed, and, after argument thereon, sustained the same and dismissed the plaintiffs' petition; to which rulings the plaintiffs excepted. The court had already overruled a demurrer to the plaintiffs' petition, as it stood after all the various amendments thereto, save this last one, had been allowed, and the defendants had answered. Therefore no other demurrer could be legally entertained, unless this last amendment reopened the case to demurrer. An amendment which materially changes the cause of action opens the petition, as amended, to demurrer, but an immaterial amendment does not. Civil Code, § 5068. Did this amendment materially change the plaintiffs' cause of action? Did it so vary the case as to change the plaintiffs' equity? As we have seen, only the 13th and 14th paragraphs of this amendment were allowed. The allegation in the 14th paragraph, that the previously alleged and described fraudulent acts of the three defendant directors "are and have been beyond the charter powers of said corporation," added nothing to the plaintiffs' case. The acts complained of were alleged to be fraudulent, and, from the description of the same, were clearly and grossly so. It did not help the plaintiffs' case to charge that these palpably fraudulent acts of the individual defendants were ultra vires. Strictly speaking, none of them, except the alleged fraudulent issue of stock certificates, could be termed ultra vires acts of the corporation, but were, as alleged, the fraudulent acts of the individual directors, which were not perpetrated in the name of the corporation. It had already been alleged that the issue of these stock certificates was without authority of law and in violation of the charter and by-laws of the corporation. The other allegations in this paragraph are mere repetitions, in general terms, of charges previously made. It is apparent, therefore, that this paragraph of the amendment was immaterial, as it did not in any respect vary the plaintiffs' cause of action.

Let us see whether the charge contained in the 13th paragraph, that the corporation had been rendered insolvent by the mismanagement of the defendant directors, changed the equity of the plaintiffs' case. Whether the corporation was solvent or insolvent, the plaintiffs were not entitled to have a receiver appointed for the purpose of taking charge of its property and affairs and carrying on its business for the benefit of the stockholders. *Empire Hotel Co.* v. *Main*, 98 *Ga.* 176, 184; 2 Cook on Stock & Stockholders, § 746. Therefore the allegation of insolvency was immaterial so far as the prayer of the plaintiffs that a receiver should be appointed for this purpose was concerned. For a similar reason, this allegation was immaterial when considered in connection with the prayer that a receiver should be appointed, and all the property and franchises of . the railroad company sold, and the proceeds of the sale, after paying the expenses incident thereto, applied to the payment of its debts, and the balance, if any, distributed among the stockholders in proportion to their respective shares. Whether the corporation was solvent or insolvent, the court had no power to grant this prayer. In the absence of express statutory authority, a court of equity has no power to dissolve a corporation and appoint a receiver to administer its assets. High, Rec. (3d ed.) §§ 288, 289; Beach, Rec. (Alderson's ed.) 100; 9 Am. & Eng. Enc. L. (2d ed.) 601; Thomp. Corp. §§ 4538, 4539, 6703; Mor. Priv. Corp. § 282; Neal v. Hill, 16 Cal. 146, 150; Verplanck v. Mercantile Ins. Co., 1 Edw. Ch. R. 84; Bank Com'rs v. Bank of Buffalo, 6 Paige, 497; Strong v. McCagg, 55 Wis. 624; Bayless v. Orne, 1 Freem. (Miss.) 161, 172; Robertson v. Bullions, 11 N. Y. 252; French v. Gifford, 30 Iowa, 148; Wallace v. Pierce–Wallace Pub. Co., 101 Iowa, 313; State v. Merchants Ins.' & T. Co., 8 Hump. 235, 252; Baker v. Backus, 32 Ill. 79; Howe v. Deuel, 43 Barb. 504; Belmont v. Erie Ry. Co., 52 Barb. 665, 667; Fountain Ferry Turnpike R. Co. v. Jewell, 8 B. Mon. (Ky.) 142; Atty. Gen. v. Earl of Clarendon, 17 Ves. 491; Slee v. Bloom, 5 Johns. Ch. 379; Van Pelt v. U. S. Metallic Spring Co:, 13 Abb. Pr. (N. S.) 331; Atty. Gen. v. Bank of Mich., Har. (Mich.) 315; People v. Weigley, 155 Ill. 491; State Investment & Ins. Co. v. San

Francisco, 101 Cal. 135; Havemeyer *v.* Superior Court, 84 Cal. 327; Denike *v.* N. Y. Cement Co., 80 N. Y. 599.   In this State such authority has not been conferred upon courts of equity. Section 1882 of the Civil Code provides · how a corporation is dissolved in this State, viz., by expiration of its charter; by forfeiture of its charter; by a surrender of its franchise; by the death of all its members without provisions for à succession.

If a court of equity can not dissolve a corporation, can it do what would be — certainly in a case of the present character — tantamount to the same thing, that is, appoint a receiver, sequester its property, decree a sale of all of its property and franchises and a distribution of the fund arising from such sale among its creditors and stockholders?   When the affairs of a railroad corporation are wound up, its property, including its franchise to construct, own, and operate a railroad between designated points, all sold, and the proceeds of the sale distributed to creditors and stockholders, is it not, for all practical purposes, dissolved?   Theoretically it may not be dissolved, because having once been created and organized as a corporation, so long as the mere right to be a corporation, which does not pass by a sale of its corporate franchises, continues, the mere, naked, legal entity, known by a designated name as a particular corporation, may still survive, but for every conceivable practical purpose the corporation is as completely destroyed as it would be if a decree of corporate dissolution had been regularly and legally rendered.   The principle that a court of equity can not dissolve a corporation would be utterly useless if, upon the application of minority shareholders, a going railroad corporation can be put into the hands of a receiver, its property and franchises sold, and the proceeds thereof distributed to its creditors and stockholders. A railroad corporation shorn in this way of all its property and corporate franchises, helpless and hopeless, might exist, in legal contemplation, as a pure mental abstraction; but it would be mere mockery to hold that the court by the exercise of whose power it was reduced to this state of helpless and permanent inertia could not dissolve it.   In our investigation we have found a few instances, in each of which an exceptionally

strong case was made for the interposition of equity, where courts have held that the affairs of a mere private business corporation could be wound up by a court of equity, upon the application of minority stockholders. But we are aware of no instance in which this power has been exercised, upon the petition of minority shareholders, in reference to a going railroad corporation, which is a quasi public corporation, whose charter and franchises were conferred upon it, not for the mere benefit of its stockholders, but, in a large measure at least, in order that it might construct, maintain, and operate a public highway, and in connection therewith discharge important duties, directly affecting the interests of the public, the continued and faithful discharge of which is a matter of public concern. If there is such a case, it has escaped our attention.

We are of opinion that the court had no power to grant the prayer for a winding up of the affairs of the corporation and a distribution of its assets among its creditors and shareholders. In support of this opinion we cite the following authorities: Thomp. Corp. § 4539; Spelling, Extraord. Rel. § 758; Hinckley v. Pfister, 83 Wis. 64; Strong v. McCagg, supra; State v. Merchants Ins. Co., 8 Humph. (Tenn.), 235, 252; Com. v. Union Ins. Co., 5 Mass. 230; Denike v. N. Y. Cement Co., 80 N. Y. 599; Baker v. Backus, 32 Ill. 79; Ramsey v. Erie Ry. Co., 7 Abb. Pr. (N. S.) 156, 181; Howe v. Deuel, supra; Latimer v. Eddy, 46 N. Y. 61; Belmont v. Erie Ry. Co., 52 N. Y. 637, 665; Hardon v. Newton, supra; Mason v. Supreme Court of Equitable League, 77 Md. 483; Brown v. Home Savings Bank, 5 Mo. App. 1; Wallace v. Pierce—Wallace Pub. Co., supra; Mor. Priv. Corp. 283; Bayless v. Orne, French v. Gifford, Atty.-Gen. v. Bank of Mich., supra. It is, we think, very clear that the allegation of the insolvency of the corporation added nothing material to the strength of the plaintiffs' case, so far as the other prayers of the petition are concerned. Whether they were, or were not, entitled to any particular portion of such relief did not depend upon the solvency or insolvency of the corporation. Certainly this is true in reference to the question whether they were entitled to an injunction restraining the defendants from a repetition of their fraudulent

acts. More good could be accomplished by such an injunction before the corporation became insolvent than afterwards. So the question whether the court had the power to compel these directors to account for the assets of the railroad company, which they had fraudulently converted to their own use, could not turn upon the solvency or insolvency of the corporation. Nor could the questions presented by the remaining prayers of the petition. It being settled that the court did not err in striking the portions of the amendment which were disallowed, and that the amendment as allowed was not of such materiality as to reopen the case to another demurrer, the only questions upon which the rulings of this court have been invoked have been disposed of. We, therefore, express no opinion as to the character and extent of the relief to which the plaintiffs are entitled, if the allegations contained in their pleadings are sustained by the evidence, as such an opinion would be merely obiter.

*Judgment reversed. All the Justices concurring.*